## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAMON SMITH,** | : | No. 3:20cv580 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **CLUB EXPLORIA LLC d/b/a POCONO** | : | |
| **MOUNTAIN VILLAS,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Before the court is a motion for summary judgment (Doc. 33) filed by

Defendant Club Exploria, LLC d/b/a Pocono Mountain Villas. Having been fully

briefed, this matter is ripe for disposition.[1]

**Background**

This matter involves Plaintiff Damon Smith's claims of employment

discrimination and retaliation brought pursuant to Title VII of the Civil Rights Act

of 1964 ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA").  In his

four-count complaint filed on April 6, 2020, Plaintiff Damon Smith alleges that he

sold timeshares at Pocono Mountain Villas ("PMV") for thirteen months until,

within twenty-four hours, he was demoted from sales manager to sales

---

[1] The Honorable Robert D. Mariani transferred this case to the undersigned on November 7,
2023.

representative and then terminated. (Doc. 1. at ¶¶ 3, 21, 23, 37, 40, 43). Plaintiff contends that such adverse action occurred because he is African American and he complained to his sales director about an offensive and racist meme sent by a fellow sales manager in a group text. (Id. at ¶¶ 20, 26-36). Plaintiff alleges he was the only African American sales manager at PMV. (Id. at ¶ 40).

Plaintiff was recruited to work at PMV as a sales representative in February 2018 by its director of sales, Matthew Merriam.[2] Plaintiff and Merriam previously worked together for another company and plaintiff listed Merriam as a reference on his job application. Plaintiff reported directly to Merriam throughout his employment. In May 2018, Merriam promoted plaintiff to in-house sales manager. That same month defendant acquired PMV.

Around Thanksgiving 2018, another PMV manager shared a meme in a work-related group text. (Doc. 38-2, Exh. A, Dep. of D. Smith at 77:17-78:10). Per plaintiff's exhibits in opposition to summary judgment, the meme depicts Buckwheat[3] dressed as a chef and posing with a turkey. (Doc. 38-2, Exh. D). The caption reads, "Happy Tanks Gibbin! O Tay[.]" (Id.)

_____

[2] Citations to the record are provided only where plaintiff disputes defendant's statement of material facts or the parties argue the record is subject to differing interpretations or characterizations. All facts are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

[3] Buckwheat was a character featured in the *Our Gang/Little Rascals* series of shorts produced in the first-half of the Twentieth Century. Eddie Murphy also portrayed Buckwheat in *Saturday*

Plaintiff believed that the message was posted to the group but directed at him. (Doc. 38-2, Exh. A, 78:6-17).  Shortly after, plaintiff contacted Merriam by telephone to address its offensiveness and his unhappiness.  (Id. at 77:24-78:2, 79:3-11).  Per plaintiff, Merriam said he would "take care of it." (Id. at 78:2-3).  Plaintiff testified that he did not report the meme to the human resources department ("HR") or anyone else at PMV based on Merriam's assurances. (Id. at 80:14-20).  Plaintiff alleges Merriam did not act following this incident and the defendant indicates that it has no record of the meme or any complaint from that time.  Merriam is no longer employed by defendant and was not deposed prior to the expiration of case management deadlines. (See Doc. 31).

In January 2019, however, plaintiff was disciplined by Merriam after a female employee made a complaint that plaintiff said something sexually suggestive to her as she was eating.  Plaintiff admitted making a specific statement to that employee, but stated he meant nothing inappropriate by his comment.  Plaintiff received a verbal warning, and the incident was noted in his

---

*Night Live* skits in the 1980s.  As stated, Buckwheat is a "stereotypical black character" and "in the context of employment discrimination law," that use of that name as a term for a person is "generally considered to be a racial slur or epithet." Boyd v. State Farm Ins. Companies, 158 F.3d 326, 329, n. 1 (5th Cir. 1998)(citations omitted); see also Edwards v. City of Chicago, No. 04 C 3395, 2006 WL 794743, at *5 (N.D. Ill. Mar. 23, 2006).

personnel file in an employee counseling report. (Doc. 35, Exh. A-4, EXPL000016).

That same month, defendant introduced a new commissions plan, changing how plaintiff was compensated.  There is a factual dispute between the parties over plaintiff's reaction to the change.  Plaintiff testified that he communicated frustrations with the new policy directly to Merriam, but believed the new system was beneficial to him as "the top producer" at PMV.  (Doc. 38-2, Exh. A at 86:16-24).  In the motion for summary judgment, however, defendant advances that plaintiff "sought out ways" and "workarounds to ensure that he could still earn as much as commissions as before, to the detriment of other sales managers." (Doc. 35 at ¶¶ 37-38).  This included asking sales representatives to only list plaintiff as the sales manager on sales records so that plaintiff could be credited for all commissions earned on sales by those representatives. (Id. at ¶ 38).  Plaintiff counters that such "facts" are premised on unsupported employee statements made through defendant's HR witness. (Doc. 38-1 at ¶¶ 37-38).

The parties agree that, on Sunday, March 10, 2019, plaintiff met with Merriam and two senior sales managers.  The rest of what happened is disputed.  Plaintiff testified that he was demoted in that meeting for "[n]o specific real

reason other than. . . the rotation[4] that was not company policy." (Doc. 38-2, Exh. A at 93:17-20).  Plaintiff also testified that he complained to Merriam about another employee being promoted to senior sales manager. (Id. at 97:15-24, 98:17-23).  Emails and HR records supplied by defendant portray a different situation.  Merriam sent an e-mail to HR the next morning regarding the meeting, indicating that he had issues with the "visible demeanor" plaintiff was displaying at work and plaintiff's "open" feelings about the new compensation plan.  (Doc. 35, Exh. A-5, EXPL000014).  Merriam also relayed "overwhelming" information about plaintiff from other employees about his efforts to increase his commissions under defendant's new compensation system. (Id.)  An employee counseling report completed by Merriam indicates the demotion was due to plaintiff "not displaying a professional and condusive role that we expect from a leadership role and or as manager [sic]." (Doc. 35, Exh. A-6, EXPL0000162). Merriam indicated he would revisit plaintiff's "professionalism" and plaintiff's work to regain his position at the thirty-day mark. (Id.)  Plaintiff testified about the demotion meeting as follows:

> Q. Did [Merriam] bring up your race in any way?
> A. Other than the fact that I should be grateful of having the opportunity, you know. I forget how he put it, where you come from, whatever.  Yeah, so...

---

[4] "The rotation" is not further explained in the record supplied by the parties.

> Q.    Did you understand that comment to be related to
>        your race?
>
> A.    I thought it was.

(Doc. 38-2, Exh. A at 96:4-12).

The next day, however, plaintiff was terminated by Merriam after Merriam consulted with Shannon Price, the HR manager.   Per Price's testimony, Merriam maintained the ability to demote plaintiff without her involvement. (Doc. 38-2, Exh. E. 71:8-18).  According to Price, however, Merriam could only terminate employees with her approval. (Doc. 38-2, Exh. E. 43:11-14, 95:23-96:13). Merriam is alleged to be Caucasian. (Doc. 1 at ¶ 28).

Regarding plaintiff's termination, a senior sales manager present at plaintiff's demotion, Kathleen Wallace, e-mailed Merriam and Price after encountering plaintiff while going into the building the next morning, Monday, March 11, 2019. (Doc. 35, Exh. A-7, EXPL0000117).  Per Wallace's e-mail, plaintiff allegedly said, "I'll hang around like he offered and take some tours, but this is fu_ _ _ _ _ bull sh_ _ [sic][.]" (Id.)  Price, responding to Merriam's e-mail about the demotion and Wallace's e-mail about the incident indicated, "I don't know why we would want to keep him on your sales line[.]" (Doc. 35, Exh. A-8, EXPL0000118).  She further indicated, "I think termination would be best, unless you feel otherwise." (Id.).  Merriam responded, "I agree and will take care of it." (Id.).

6

Plaintiff admits that he used profanity in his conversation with Wallace. (Doc. 38-2, Exh. A at 106:24-107:9, 108:10-17).   An employee counseling report completed by Merriam indicates the termination was related to plaintiff "still display[ing] a very negative demeanor." (Doc. 35, Exh. A-9, EXPL0000166).

Price conducted an exit interview with plaintiff on March 18, 2019.  Plaintiff testified that he discussed the meme directly with Price for the first time at that point. (Doc. 38-2, Exh. A, at 80:21-81:7).  Price testified that she did not see the meme until plaintiff filed an EEOC complaint. (Doc. 38-2, Exh. E at 33:5-9).  She attests that Merriam also did not tell her about the meme. (Doc. 35, Exh. A. at ¶ 14).  Per Price, that meme would violate defendant's non-discrimination and anti-harassment policy statement. (Doc. 38-2, Exh. E at 31:2-35:8).  The sales manager that sent the meme was still employed by the defendant as of the date of Price's deposition.  (Id. at 32:17-33:4). According to Price, defendant maintains no record of the other manager being disciplined for sending the meme.  (Doc. 35, Exh. A. at ¶ 14).

Plaintiff identified two other comparator employees in his complaint, one who was not disciplined for openly vocalizing her unhappiness about the new compensation plan or for using profanity, and another that used profanity while flipping office furniture.  (Doc. 1 at ¶¶ 39-40, 44-46).  Both are alleged to be Caucasian. (Id. at ¶¶ 39, 45).  Plaintiff testified about these individuals and these

7

incidents in his deposition as further discussed below.  Price indicates that no

disciplinary records or complaints exist regarding these incidents in defendant's

personnel files for the comparators.  (Doc. 35, Exh. A. at ¶ 38).

Upon completion of discovery, the defendant filed the instant motion for

summary judgment. (Doc. 33). The matter has been fully briefed, bringing the

case to its present posture.

**Jurisdiction**

Because this case is brought pursuant to Title VII of the Civil Rights Act of

1964, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts

shall have original jurisdiction of all civil actions arising under the Constitution,

laws, or treaties of the United States."). The court has supplemental jurisdiction

over plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a). ("In any civil

action of which the district courts have original jurisdiction, the district courts shall

have supplemental jurisdiction over all other claims that are so related to claims

in the action within such original jurisdiction that they form part of the same case

or controversy under Article III of the United States Constitution.").

**Standard of Review**

Granting summary judgment is proper " 'if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir.1997) (quoting FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of

9

affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Analysis**

Plaintiff brings this lawsuit pursuant to both Title VII and the PHRA for race-based discrimination and retaliation.[5]  Defendant argues that summary judgment is appropriate on each claim.

**1. Plaintiff's Race Discrimination Claims**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).

In this case, plaintiff relies on indirect evidence of race discrimination. Accordingly, the McDonnell Douglas burden shifting framework applies.  See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. ----, 140 S. Ct. 1009, 1019 (2020) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-

---

[5] "While the Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII. . .its courts nevertheless generally interpret the PHRA in accord with its federal counterparts." Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)(citations omitted).  "Insofar as claims of the kind here are concerned, the PHRA is interpreted to be coextensive with Title VII." Rosencrans v. Quixote Enterprises, Inc., 755 F. App'x 139, 142 (3d Cir. 2018). Thus, the court will only reference Title VII in this decision.

05 (1973)) (explaining that McDonnell Douglas supplies "a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination").

Under this familiar three-step framework, the plaintiff must first make a *prima facie* showing of discrimination. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)(discussing McDonnell Douglas Corp., 411 U.S. at 802). "If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. (citation and quotation marks omitted). "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. (citing Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981)). "The central focus of the inquiry in a case such as this is always whether the employer is treating some people less favorably than others because of their race. . ." Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978).

Under the first step, the plaintiff must show that he: 1) is a member of a protected class; 2) was qualified for the position; 3) has suffered adverse employment action; and 4) that the action gives rise to an inference of race-based discrimination. See id. at 410-11. "The burden of making this showing is

11

'not onerous.' " Young v. United Parcel Serv., Inc., 575 U.S. 206, 228 (2015)(quoting Burdine, 450 U.S. at 253).

Conceding the remainder, defendant argues that plaintiff cannot establish the fourth element based on a lack of comparator evidence. Specifically, defendant argues that the two individuals identified by plaintiff that did not suffer adverse action are not similarly situated and thus summary judgment must be granted. (Doc. 34 at 6).

Making the *prima facie* showing, however, does not "require the plaintiff to show that those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways." Young, 575 U.S. at 228 (citations omitted).  In his deposition, plaintiff identified two other employees who were not disciplined for displaying a lack of professionalism in the workplace or for using profanity. (Doc. 38-2, Exh. A at 102:3-103:23, 116:1-17. see also Exh. C, Dep. of S. Price, 124:21-128:2).  He described one individual as being "a very unhappy person with the situations that were going on [at PMV,]" who expressed her unhappiness "overtly." (Doc. 38-2, Exh. A at 102:14-103:19).  He testified that she had "profound – profanity-laced arguments all the time, herself as well as Mr. Merriam." (Id. at 102:20-22).  The other manager, per plaintiff, flipped tables in front of Merriam.  (Id. at 116:1-17).  Plaintiff has thus put forth that Merriam did not discipline the comparators for using profanity or for being unprofessional in

the workplace, but demoted plaintiff in a manner that plaintiff thought implicated race and then terminated him the next day. (See id. at 96:4-12).  As such, the court concludes that granting summary judgment on whether plaintiff has made a *prima facie* case would improperly take this issue from the factfinder.

Next, defendant sets forth in support of summary judgment that it has produced legitimate, non-discriminatory reasons for plaintiff's demotion and termination.  (Doc. 34 at 10-12).  Plaintiff does not challenge defendant's production under the second step.

Where an employer offers legitimate, non-discriminatory reasons, the plaintiff must then have an opportunity to prove that the employer's reasons are a pretext for discrimination.  See Burdine, 450 U.S. at 253 (citing McDonnell Douglas, 411 U.S. at 804).  "A plaintiff may defeat a motion for summary judgment . . . by pointing to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Jones, 198 F.3d at 413 (citations omitted and quotation marks removed). Put another way, the plaintiff's rebuttal evidence must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate

13

the employment action.  See Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  To discredit the employer's proffered reasons, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Id. at 765 (citation omitted, quotation marks and emphasis removed).

Defendant argues that plaintiff also fails to produce evidence of pretext or otherwise discredit the reasons for his demotion and termination.  The focus of defendant's arguments center on its HR records that show the comparators had not received a verbal warning like plaintiff did prior to his demotion and termination.  Plaintiff counters that he has responded to the motion with sufficient evidence and there are many issues for a jury to resolve regarding whether defendants' reasons for his discipline are pretextual.  After review, the court agrees with plaintiff.

Plaintiff cites evidence where a factfinder could infer pretext.  For example, the employee counseling report offered by defendant reflects that plaintiff was demoted for not displaying the professionalism that Merriam expected from a sales manager. (Doc. 35, Exh. A-6, EXPL0000162).  The report corresponding to plaintiff's termination on March 11, 2019 indicates he was fired by Merriam for displaying a "very negative demeanor" and that plaintiff was "[c]learly not what

14

we are looking for from our leadership team." (Doc. 35, Exh. A-6, EXPL0000166).

Based on the verbiage used by Merriam, a reasonable factfinder may find that

these reasons lack credibility and that the actual decision-making was based on

race.  The words and concepts used by Merriam, such as professionalism, have

different meanings, subjective components, and context-based considerations.

See Karem v. Trump, 404 F. Supp. 3d 203, 213–14 (D.D.C. 2019), aff'd as

modified, 960 F.3d 656 (D.C. Cir. 2020)("Though 'professionalism' has a well-

known common meaning, it is inherently subjective and context-dependent. Such

abstract concepts may at times indicate what is allowed and disallowed at the

furthest margins, but they do not clearly define what is forbidden or permitted in

common practice within those margins.").  And because "[d]iscrimination. . .is

often simply masked in more subtle forms[,]" a reasonable factfinder may

determine under the circumstances that Merriam's particular expressions "carry

the distinct tone of racial motivations and implications" Aman v. Cort Furniture

Rental Corp., 85 F.3d 1074, 1082-83 (3d Cir. 1996).

       As discussed above, plaintiff advances that he was demoted and

terminated by Merriam for being unprofessional and using profanity when two

others were not disciplined despite being openly negative about the workplace,

arguing with superiors using profanity, or flipping office furniture.  Looking at the

evidence in a light most favorable to plaintiff, he has also identified a third

comparator in the record, the manager who sent the meme. A reasonable factfinder could determine that the manager who sent the meme was not deemed to be unprofessional by Merriam to warrant a report to HR or any other discipline. A jury may also reasonably find that plaintiff was not labelled as unprofessional until after he challenged the other manager's behavior with Merriam.[6] Thus, defendants' arguments about the differences between plaintiff and the comparators other than race are better reserved for the factfinder, who can weigh plaintiff's credibility along with the credibility of defendant's witnesses.

Additionally, plaintiff cites evidence where a factfinder could infer *post hoc* fabrications by defendant's HR department as to the other reasons not listed in the employee counseling reports completed by Merriam. This would require the weighing of Price's testimony as defendant's HR witness along with the documentary evidence. Thus, plaintiff has established that a fact finder could discredit defendant's proffered reasons for plaintiff's demotion and termination and summary judgment on plaintiff's discrimination claims must be denied.

---

[6] Defendant asks the court to consider evidence that Merriam wanted to rehire plaintiff in a light most favorable to defendant. (Doc. 34 at 14 (citing Doc. 35, Exh. C, Dep. of D. Smith at 127:23-128:7)). In support, Defendant cites text messages between plaintiff and Merriam that have not been included in the record on summary judgment. (See Doc. 35 at ¶ 56). Plaintiff testified that he was called back because, after he was terminated, "the numbers tanked out[,]" and "were so horrible." (Doc. 38-2, Exh. A at 40:8-11). Based on this incomplete record, a reasonable factfinder may find that some of the reasons for plaintiff's demotion and termination are fabricated and/or that Merriam was trying to make up for terminating plaintiff based on his race.

### 2. Plaintiff's Retaliation Claims

Title VII's anti-retaliation provision separately provides that it is unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a).

Under similar burden-shifting framework discussed above, a plaintiff must first make out a *prima facie* case by tendering evidence that: 1) he engaged in activity protected by Title VII; 2) the employer took an adverse employment action against him; and 3) there was a causal connection between his participation in the protected activity and the adverse employment action. Kengerski v. Harper, 6 F.4th 531, 536 (3d Cir. 2021) (citations omitted); see also Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 257 (3d Cir. 2017). Likewise, after an employer sets forth legitimate non-retaliatory reasons, which are noted above in this case, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500–01 (3d Cir.1997).

Conceding the first two elements of plaintiff's *prima facie* case, defendant argues that plaintiff cannot prove a causal connection of the reporting of the meme and the demotion and termination because of the three-to-four-month

temporal proximity between these events.  Defendant also makes the same arguments as above regarding plaintiff's inability to show pretext for retaliation.

The "temporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a *prima facie* retaliation claim, at least where the timing is unusually suggestive of retaliatory motive." Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000)(citations omitted and quotation marks removed).  To be sufficient evidence of causation, the temporal proximity must be "very close[.]" Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001)(citing circuit court cases where three-to-four month periods were insufficient).

In the absence of such a close temporal proximity, however, the court can "consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." Daniels, 776 F.3d at 196.

The court has already noted where certain evidence, if credited by the factfinder, could show inconsistences in the reasons for plaintiff's demotion and termination by Merriam after plaintiff complained about the meme to him.  A factfinder could also determine that Merriam's reasons for plaintiff's demotion and termination were pretext for plaintiff's complaint about the meme and the

18

conduct of the other manager.  Looking at the circumstances as a whole in a light most favorable to plaintiff, plaintiff found a colleague's behavior racist and when he reported it to Merriam, it was plaintiff who was being demoted for lacking professionalism and not being leadership material.  Less than twenty-four hours later, plaintiff was terminated by that same boss for "displaying a very negative demeanor."  A jury can find that Merriam did not punish racist behavior, but rather found plaintiff's reaction to be more offensive than the other manager's use of crude racial stereotypes, leading to plaintiff's work interactions being more closely monitored and scrutinized.  Under these circumstances, summary judgment is inappropriate.

Further, defendant argues that Price, the HR manager, was unaware of the meme when she was "the sole decisionmaker" regarding plaintiff's termination. (Doc. 34 at 18).  This argument does not reflect the e-mails between Price and Merriam on the date plaintiff was terminated. (See Doc. 35, Exhs. A-5, A-7, A-8) In one, Price indicated to Merriam, "I think termination would be best, **unless you feel otherwise.**" (Id., Exh. A-8 (emphasis added)).  Price's word choice suggests that Merriam's position held more importance in the decision to terminate plaintiff than defendant advances.  "[T]he people 'responsible for the adverse action' must know of the protected conduct 'at the time they acted.' " Giuseffi v. Sec'y United States Dep't of Homeland Sec., 810 F. App'x 96, 99 (3d Cir. 2020)

(quoting <u>Daniels</u>, 776 F. 3d at 196).  Here, plaintiff has set forth that Merriam

knew of the meme, failed to discipline the employee or report the incident to HR,

and then was the person who ultimately decided to demote and terminate

plaintiff.  Merriam's motives thus remain a question for the jury.  Based on the

record, defendant's arguments for summary judgment fall short.

**Conclusion**

For the reasons set forth above, defendant's motion for summary judgment

(Doc. 33) is **DENIED**.


**Date:** ___2/20/24___


**JUDGE JULIA K. MUNLEY**
**United States District Court**